**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 08-21811-CIV-SEITZ/O'SULLIVAN

AMERICAN NATIONAL FIRE INS. CO., et al.,

        Plaintiff,

vs.

M/V SEABOARD VICTORY, etc., et al.,

        Defendants.

_____/

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING SEABOARD'S MOTION FOR PARTIAL SUMMARY JUDGMENT

THIS MATTER is before the Court on Plaintiffs' Motion for Summary Judgment [DE-65] and Defendant Seaboard's Motion for Partial Summary Judgment [DE-62]. This is an action governed by the Carriage of Goods By Sea Act, Pub. L. No. 74-521, ch. 229, 49 Stat. 1207 (reprinted in the notes to 46 U.S.C. § 30701) ("COGSA"), in which the subrogee of a distributor seeks to recover damages for lost cargo against Defendants, who were responsible for shipping the distributor's goods from Miami to Panama. The distributor, Motta Internacional S.A. ("Motta"), engaged Defendant, Seaboard Marine, Ltd. ("Seaboard"), to transport cargo from a warehouse in Miami, operated by Motta's affiliate, to a Motta warehouse in Panama. After Motta unloaded Seaboard's container, it claimed that some of that cargo, namely 1 box of Canon cameras and 252 cartons of Nintendo Wiis, was missing. Motta's subrogees, Plaintiffs, American National Fire Insurance Company and Great American Insurance Company of New York, then brought this action against Seaboard and its agent Newport Trucking Company ("Newport") pursuant to Seaboard's bill of lading, which is governed by COGSA.

Plaintiffs move for summary judgment against Seaboard on the grounds that no genuine issue of material fact exists to dispute Plaintiffs' claim. Defendants' response is an attack on the evidence underlying Plaintiff's prima facie case, asserting that the elements of that case rest on contested factual premises. However, "when a defendant chooses to ground its attack in disparagement of the plaintiff's

prima facie case (rather than, for example, offering affirmative evidence proving that the damage did not occur while in the defendant's custody, or indicating that the injury fell under one of COGSA's exceptions to liability), it runs a heavy risk." *Transatlantic Marine Claims Agency, Inc. v. M/V "OOCL Inspiration,"* 137 F.3d 94, 101 (2d Cir. 1998). Seaboard's attempts to undermine Plaintiff's prima facie case do not raise a genuine issue of material fact and Seaboard presents no evidence to establish it was not fault. As a result, Plaintiffs are entitled to summary judgment. Furthermore, under the limitation-of-liability provision in Seaboard's bill of lading, Plaintiffs are entitled to damages of $126,500 for the loss of 253 packages of cargo, plus prejudgment interest and costs.

## I.      Statement of Facts

Plaintiffs filed this action to recover damages for lost cargo on June 25, 2008.  In their instant Motion for Summary Judgment, they maintain that as a matter of law they are entitled to a judgment of $126,500.00 per the bill of lading's limitation-of-liability provision for loss of 1 box of Canon cameras and 252 cartons of Wii consoles, plus prejudgment interest and costs.  Seaboard has filed a cross-motion for Partial Summary Judgment on damages, asserting that Plaintiffs can only be entitled to $3,500 in damages under the limitation-of-liability provision, calculated based on a loss of 1 box of Canon cameras and 6 pallets of Wii consoles.  The following facts are undisputed unless otherwise noted.

### A.      Order of Wiis and Initial Attempt to Transport Cargo

Pursuant to a purchase order from Motta, Nintendo delivered 803 cartons of Wii consoles to a warehouse in Miami operated by Crossroads Inc. ("Crossroads").  (DE-71, Declaration of Guillermo Ortega ("Ortega Dec.") ¶ 3; DE-71-2, Ortega Dec., Ex. A).[1]  Crossroads is an affiliate of Motta and warehouses merchandise that Motta purchases.  (DE-66, Declaration of Jeannine Blandon ("Blandon

---

[1]  Some evidence indicates that the consoles were initially sent to a company called Latamel that transfers inventory to Crossroads before shipment to Panama.  (DE-86-4, Ortega Dep. at 27-28; DE-71-19, Ortega Dec., Ex. R).  While it is not clear to the Court whether Nintendo sent the consoles to Latamel instead or directly to Crossroads, it is undisputed the Wiis at issue were pulled from inventory and loaded for shipment to Panama and it is not material whether the Wiis were sent directly to Crossroads or instead through Latamel.

Dec.") ¶ 3).  According to the delivery receipt, those 803 cartons collectively weighed 20,467 pounds, or approximately 25.49 pounds a carton.  (Ortega Dec. ¶ 5; Ortega Dec., Ex. A).

Crossroads then removed some of the Wiis from inventory to prepare them for shipment to Motta's warehouse in Panama.  To initiate the transfer, Crossroads generated an internal invoice bearing a purchase order number of 896377 reflecting Crossroads' intent to send to Panama 467 cartons in 11 pallets (42 cartons to a pallet) and 5 separate cartons.  (DE-72-6, Ex. 2; DE-72-4, Chipsen Dep. at 16).  The weight of a shrink-wrapped pallet with 42 cartons is 1,042 pounds.  (Ortega Dec. ¶5; DE-71-17, Ortega Dec., Ex. P).  A corresponding "pick slip" generated on July 16, 2009 indicates that 11 pallets and 5 extra cartons of Wiis were selected from inventory pursuant to the purchase order identified on Crossroads' internal invoice (number 896377).  (DE-71-18, Ortega Dec., Ex. Q).[2]  A checkmark on the pick slip reflects that these cartons were removed from inventory and staged to be loaded. (Ortega Dec. ¶ 39).  A Crossroads warehouse receipt dated July 17, 2007 (W.R. 12180) reflects the processing of purchase order 896377 consisting of 11 pallets of Wiis.  (Ortega Dec., Ex. P).

Crossroads then attempted to ship these Wiis and other cargo to Panama on an American President Line ("APL") container.  Though Crossroads had customarily used Seaboard to ship cargo to Panama, Motta asked Crossroads in May of 2007 to use Eagle Global Logistics ("Eagle") as a logistics provider and Eagle wanted to use APL for a shipment to Panama at that time.  (Blandon Dec. ¶¶ 5-6).  On June 13, 2007, empty APL Container No. TGHU 7486648 ("APL Container") arrived at Crossroads' warehouse.  (Blandon Dec. ¶ 7; DE-71-4, Ortega Dec., Ex. C).[3]  On July 9, 2007, Eagle supplied

---

[2]  Seaboard notes that Motta's warehouse manager testified that Wii shipments arrive in pallets containing anywhere from forty to fifty cartons. (DE-86-3, Lan Dep. at 31).  However, Seaboard offers no evidence to dispute that the shipment of 467 cartons at issue in this case were packed onto 11 pallets, with 42 cartons to a pallet, and 5 extra cartons.

[3]  The Parties dispute whether the APL container sat in the Crossroads yard for a number of weeks after its arrival or was sent to the Port of Miami shortly after its arrival.  Crossroads' shipping coordinator states that the APL Container sat in Crossroads' yard for some time "as a result of Eagle's inability to obtain space on an available APL vessel going to Panama." (Blandon Dec. ¶ 7).  Crossroads' warehouse manager testified in a deposition that a packing certificate indicated the APL Container was loaded and sealed on June 18, 2009, but then testified the certificate might not accurately reflect the date the container was loaded.  (DE-86-4, Ortega Dep. at 20-25).

Crossroads with booking information for an APL vessel scheduled to depart on July 18, 2007.  (Blandon Dec. ¶ 8; DE-66-2, Blandon Dec., Ex. A).

Accordingly, on July 17, 2007, Crossroads personnel loaded the APL Container.  (Ortega Dec. ¶ 7).  The loading list for the APL Container that itemizes each item of cargo loaded indicates that Crossroads loaded the APL Container with cargo weighing a total 18,530 pounds.  (DE-71-5, Ortega Dec., Ex. D).  This cargo included the 467 Nintendo Wii cartons, consisting of 11 pallets of Wii cartons and an additional 5 cartons that were either added to the Wii pallets or to other pallets in the APL Container.  (Ortega Dec. ¶¶ 39-40).  It also included a box of Canon cameras weighing 314 pounds.  (Ortega Dec., Ex. D; DE-71-12, Ortega Dec., Ex. K).  All of the weights on the packing list were derived from either measurement at Crossroads' warehouse or shipping documents.  (Ortega Dec. ¶ 11).

Crossroads personnel then closed and sealed the APL Container and sent it to the Port of Miami.  Guillermo Ortega, Crossroads' warehouse supervisor, had the doors of the APL Container closed in his presence and had seals placed on the inner door closing mechanisms on both the right and left doors.  (Ortega Dec. ¶ 43).  Additionally, he had a bar seal installed between the two inner door closing mechanisms and secured in place with a locking pin.  (*Id.*).  Once the APL Container was closed and sealed, a driver from Salom Transportation picked up the container to take to the Port of Miami.  (Ortega Dec. ¶ 44; DE-71-20, Ortega Dec., Ex. S).  However, the APL Container could not be loaded on the APL vessel that was scheduled to leave on July 18, 2007.  (Blandon Dec. ¶ 22).

**B.      Delivery of Cargo to Seaboard**

As a result, Crossroads ordered an empty container from Seaboard to transport the cargo and had Eagle return the loaded APL Container to the Crossroads warehouse.  (Blandon Dec. ¶ 23).  Crossroads booked a "House/House" move with Seaboard, meaning that Seaboard was to pick up the loaded container from Crossroads and deliver it to Motta's warehouse in Panama.  (DE-73-2, Velez Dep. at 37-

---

However, this dispute is not material.  The Parties do not dispute that the APL Container was sent to the Port of Miami on July 17, 2009 and returned to Crossroads' warehouse on July 20, 2009.

38; Blandon Dec. ¶ 24; DE-66-25, Blandon Dec., Ex. X).  On July 19, 2007, Seaboard received empty

Seaboard Container SMLU 780661-2 ("Seaboard Container").  (Ortega Dec. ¶ 47; DE-71-22, Ortega

Dec., Ex. U).

      On July 20, 2007, Crossroads employees transloaded cargo from the APL Container into the

Seaboard Container.  Salom brought the APL Container back to Crossroads at approximately 11:10 a.m.

(Ortega Dec. ¶ 45; DE-71-21, Ortega Dec., Ex. T).  Crossroads personnel then broke the three seals on

the APL container, removed all of the cargo therein, and, with the exception of cargos of cigarettes,

perfumes and ORM-D ("Other Regulated Materials-Domestic") materials, loaded the cargo into the

Seaboard Container.  (Ortega Dec. ¶ 48).

      Crossroads generated a new packing list to reflect the cargo transloaded into the Seaboard

Container.  (Ortega Dec. ¶ 55).  With the cigarettes, perfume and ORM-D materials omitted, this new

loading list reflected a total cargo weight of 12,211 pounds.  (Ortega Dec. ¶ 55; DE-71-25, Ortega Dec.,

Ex. X).  Crossroads also created a load list identifying the contents of the Seaboard Container and sent it

to Motta's warehouse in Panama.  (Blandon Dec. ¶ 33; DE-66-30, Blandon Dec., Ex. CC).  The load list

reflected the number of Wii cartons being shipped, but not the number of Wii pallets.  (Blandon Ex. CC;

Lan Dep. at 33-36).

      Seaboard subsequently issued a bill of lading for the shipment providing for "house-to-house"

transport of Motta's cargo such that the provisions of COGSA were to govern "before loading on and

after discharge from the vessel and throughout the entire time the Goods or Containers ... are in the care,

custody and/or control of [Seaboard and its] agents."  (DE-66-32, Blandon Dec., Ex. EE).  The bill of

lading identified the "No. of Pkgs." as "1."  (*Id.*).  However, the cargo was described as "1 40' DRY

HIGH CUBE CNTR S.L.W.C. 487 PCS CONTG ELECTRONICS-VIDEO GAMES PHOTO

CAMERA."  (*Id.*).  The bill of lading also confirmed Crossroads' packing list weight of 12,211 pounds,

but contained the limiting language "Particulars Furnished By Shipper."  (*Id.*).

      Additionally, the bill of lading contained a provision limiting Seaboard's liability in the event of

loss or damage to the cargo:

> 20.  LIMITATION OF LIABILITY.
> Except as otherwise provided in this Clause or elsewhere in this Bill of Lading, in case of any loss or damage to or in connection with cargo exceeding in actual value the equivalent of $500 lawful money of the United States, per package, or in case of cargo not shipped in packages, per shipping unit, the value of the cargo shall be deemed to be $500 per package or per shipping unit. ...  The words "shipping unit" shall mean each physical unit or piece of cargo not shipped in a package, including articles of things of any description whatsoever, except cargo shipped in bulk, and irrespective of the weight or measurement unit employed in calculating freight and related charges.

(*Id.*).

Once the transloading was completed and the doors closed, Ortega placed yellow bullet seals 355476 and 35477 on the inner closing mechanisms of the right and left hand closed doors.  (Ortega Dec. ¶ 54).  He also placed a bar seal, with seal No. 16007, between the two inner closing mechanisms, which was secured with a locking pin that was also numbered 16007.  (*Id.*).  At the time that he placed the locking pin into the bar seal bracket affixed to the right-hand door (the "Locking Bracket"), there was no hole drilled into the back side of the Locking Bracket.  (*Id.*).  Ortega then took photographs of the closed and sealed doors, which indicate the Container was closed and sealed by 12:15 p.m.  (Ortega Dec. ¶ 53; DE-71-24, Ortega Dec., Ex. W).  A driver from Seaboard's agent, Defendant Newport Trucking Company ("Newport"), left Crossroads' warehouse in Northwest Miami with the Container at about 1 p.m.  (Ortega Dec. ¶ 57).

However, the Newport truck carrying the Seaboard Container did not weigh in at the Port of Miami until three hours later and its cargo weighed substantially less than the 12,211 pounds reflected on the bill of lading.  At 3:59 p.m., a weight ticket generated at the Port indicates the Container only contained 5,600 to 6,700 pounds of cargo, after taking into account the weights of the empty truck, empty container and chassis.[4]  A Seaboard checker at the Port of Miami affixed a seal on the right door, but did

---

[4]  The weight of the truck, including the tractor, chassis, empty container and cargo, was 39,600 pounds.  (Velez Dep. at 57; DE-73-4, Plfs' Ex. 7).  The tractor weighed 17,500 pounds.  (DE-70-2, Miller Dep. (Volume II) at 6-7; Miller Dep., Ex. D, pages 85-91).  The 40-foot chassis weighed approximately 6,800 pounds.  (Velez Dep. at 59; DE-73-5, Plfs' Ex. 10 at page 16).  The empty container weighed between 8,530 and 8,600 pounds.  (*Id.*).  As a

not check behind the bar lock seal or look for evidence of tampering with the rivets or bolts in the rear doors. (DE-67-2, Gonzalez Dep. at 12-13, 23-25, 38).

### C.    Outturn in Panama

On July 26, 2007, the Seaboard Container arrived at Motta's warehouse in Panama at about 12:25 p.m. (Lan Dep. at 38). Before moving the Container to a staging area for unloading, Motta personnel put the Container in an enclosed hangar with metal doors that could only be accessed through a locked gate. (DE-72-2, Williams Dep. at 22-23). Security guards monitored the hangar at all times. (Williams Dep. at 23).

Motta personnel opened the Container at about four o'clock the afternoon of Friday, July 27, 2007. (Lan Dep. at 18-19). A warehouse supervisor who managed the unloading, Gerardo Lan, used a delivery document he received from Motta's import department titled, "Declaracion de Movimento," to verify the container number and seal numbers. (Lan Dep. at 6, 18; DE-12, Ex. 21). He also used the load list Crossroads had sent to Panama in order to verify the contents of the Container. (Lan Dep. at 8). Lan briefly examined the Container to verify the numbers on the seals matched those on the delivery document. He observed that the seals were intact and without the appearance of tampering. (Lan Dep. at 9, 33, 51; DE-74, Ex. 8).[5] The bullet seals and bar seal were then cut with pliers so the Container could be opened and unloaded. (Lan Dep. at 9-10).

---

result, the weight of the cargo at that time was, at most, 6,770 pounds.

The record indicates the weight of the cargo may have been closer to 5,600 pounds. Plaintiff's expert, Brian Mahoney, came up with a cargo weight of 5,600 pounds after subtracting the weight of the empty container, chassis and "the weight of what a Tractor of that type weights." (DE-69, Declaration of Brian Mahoney ("Mahoney Dec.") ¶ 25). A Seaboard witness testified that "whoever is loading the vessel" provided a container weight of 14,300 pounds (Velez Dep. at 72), resulting in a cargo weight of about 5,770 pounds. These calculations all clearly indicate the weight of the cargo while it was in Seaboard's possession in Miami was significantly less than the weight of 12,211 pounds in the bill of lading.

[5] Plaintiffs assert in their opening brief and reply that Lan saw a hole in the back of the bar seal, but have not submitted record evidence to the Court in support of that fact. The portion of the record to which Plaintiff cites to establish this fact (Lan Dep. at 24) is not attached to their briefs. Furthermore, the video of the loading indicates that Lan could not have seen the hole at the time of unloading because he never attempted to look behind the bar seal before it was removed. (Ex. 8).

Upon opening the Container, Motta personnel found only 5 Wii pallets and an empty box that was supposed to have contained 116 Canon cameras. Lan immediately noticed that the box for Canon cameras was empty. (Lan Dep. at 19-20). As a result, he notified Ricardo Williams, Motta's import and claims manager, of the missing Canon cameras just after the Container was unloaded. (*Id.*). Motta sent Seaboard a claim letter for the missing Canon cameras on July 30, 2007. (Williams Dep. at 16).

The Locking Bracket was not removed at the time of unloading because the personnel unloading the truck did not have an electric saw to cut the bar seal. (Lan Dep. at 9-11). However, Lan had a welder remove it at a later time with a torch because he knew the seals would be needed to investigate the shortage of Canon cameras (Lan Dep. at 43). A photograph of the seals was taken, but it only depicts the front side of the Locking Bracket showing the number of the seal. (DE-72-11, Ex. 10, page 14).

While Motta personnel immediately realized the Container was missing Canon cameras, they did not know that 6 pallets of Wiis were missing from the Container at the time it was opened. Lan observed the removal of five pallets and a single carton of Nintendo Wiis, but did not notice that six pallets of Wiis were missing because the load list only identified the number of cartons of Wiis that were loaded, not the number of pallets. (Lan Dep. at 31-33). Also, Lan's job was to verify the identity and condition of the Container, not the quantity of the goods contained therein. (*Id.*). However, Lan later confirmed for an electronics warehouse manager, Fulvio Trolla, that only five pallets were unloaded from the container. (Lan Dep. at 17). Trolla then informed Motta's import and claim manager Ricardo Williams on August 1, 2007 that six pallets of Wiis were missing from the Container. (Williams Dep. at 13). As a result, Motta sent a second claim letter to Seaboard on August 1, 2007 stating that "at the time of unloading on July 27, 2007 we found ourselves with a shortage of 6 pallets of Nintendo Wiis ... and 116 pieces of Canon Cameras." (Williams Dep. at 15; DE-72-9, Ex. 5).

A surveyor came to Motta's warehouse on Tuesday July 31, 2007 to follow up on the claim for the missing Canon cameras. (Ex. 10, page 5). Williams informed the surveyor of the missing Wiis on August 1, 2007 and they then watched a video of the unloading of the Container to confirm only five

pallets were unloaded. (Williams Dep. at 18-21, 31; Ex. 10, page 5). The surveyor examined the bar seal and corroborated the number on the seal, but his report does not note whether a hole was drilled into the back of the Locking Bracket. (Ex. 10, page 5). Williams also handled the seals some time after they were removed, but did not look for or observe a hole drilled into the back of the Locking Bracket. (Williams Dep. 74-75).

After Motta paid Nintendo for the Wiis and presented a claim to Plaintiffs, Plaintiffs hired a marine surveyor, Brian Mahoney Jr., to investigate the cause of the loss of cargo. Mahoney examined the seals at an unspecified date and examined the Seaboard Container on November 13, 2007. (Mahoney Dec. ¶ 27). Mahoney found that a hole had been drilled into the back of the Locking Bracket and opines that the hole would enable removal of the locking pin and opening of the bar seal. (Mahoney Dec. ¶¶ 20-21; DE-69-7, Mahoney Dec., Ex. F). Furthermore, Mahoney found evidence of tampering with the right door inner locking device that would enable bypass of a seal on the door. Specifically, he observed that the unusual shape of one of the rivets on the locking device, rust patterns on that rivet and fresh gouge in the paint on the door surface suggested that the original rivet had been removed and replaced with a secondary rivet. (Mahoney Dec. ¶¶ 30-33). He opines that the right-hand door of the Container could have been opened by removing the original rivet to bypass the door lock. (Mahoney Dec. ¶¶ 34-35).

**II.      Summary Judgment Standard**

Summary judgment under Fed. R. Civ. P. 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden may be met by "showing" or "pointing out" to the Court that there are no genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*) (quoting *Celotex*, 447

U.S. at 325).  Once the initial burden is met, the non-moving party must go beyond the pleadings and

"come forward with '*specific facts* showing that there is a genuine issue for trial.'"  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis

added); *see also Celotex*, 477 U.S. at 324.  In so doing, the non-moving party "must do more than simply

show that there is some metaphysical doubt as to the material facts."  *Id.* at 586.  Instead, a mere

"scintilla" of evidence supporting the opposing party's position will not suffice and there must be a

sufficient showing that the jury could reasonably find for that party.  *Anderson*, 477 U.S. at 252; *see also*

*Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

When deciding whether summary judgment is appropriate, the Court must view the evidence and

all reasonable factual inferences therefrom in the light most favorable to the non-moving party.  *Denney*

*v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).  However, "[i]f the non-moving party fails to

'make a sufficient showing on an essential element of her case with respect to which she bears the burden

of proof,' then the court must enter summary judgment for the moving party.'"  *Id.* at 1181 (quoting

*Celotex*, 477 U.S. at 323).  Despite the unique burden shifting provisions in COGSA, "the treatment of a

summary judgment motion under COGSA is no different from the way similar motions are dealt with in

any other litigation."  *Transatlantic Marine Claims Agency, Inc. v. M/V "OOCL Inspiration,"* 137 F.3d

94, 101 (2d Cir. 1998).

## III.     Analysis

"To hold a carrier liable for missing or damaged goods under COGSA, a shipper must prove that

the goods were damaged or lost while in the carrier's custody."  *Plastique Tags, Inc. v. Asia Trans Line,*

*Inc.*, 83 F.3d 1367, 1369 (11th Cir. 1996).  The shipper meets this burden and establishes a prima facie

case by showing (1) full delivery of the goods in good condition to the carrier, and (2) outturn by the

carrier of the cargo with damages or missing goods.  *Id.*  However, "[a] plaintiff shipper is not required

to prove that the carrier was at fault, or how the damage might have occurred."  *M. Goldetz Export Corp.*

*v. S/S Lake Anja*, 751 F.2d 1103, 1109 (2d Cir. 1985).

Page 10 of  22

Once a shipper establishes a prima facie case, the burden of proof shifts to the carrier to demonstrate either (1) it exercised due diligence to prevent the cargo damage, or (2) the damage was caused by an "excepted cause" listed in COGSA's Section 4(2). *Banana Servs. Inc. v. M/V Fleetwave*, 911 F.2d 519, 521 (11th Cir. 1990). As a result, "COGSA's framework ... places the risk of non-explanation for mysterious maritime damage squarely on defendants." *Transatlantic Marine Claims Agency, Inc. v. M/V "OOCL Inspiration*," 137 F.3d 94, 98 (2d Cir. 1998). "While it is true that the burden is on the plaintiff to establish a prima facie case under COGSA, a defendant must offer more than blanket assertions about mysterious possible causes if it is to survive a motion for summary judgment." *Id.* at 101-102. "[I]f the defendant's evidence is so weak that it inflicts no meaningful damage to the plaintiff's prima facie case, the defendant will have judgment entered against it." *Id.* at 101.

1.      **Delivery of Goods**

First, the Court must address whether Plaintiffs have established Seaboard's receipt of the Canon cameras and Wii pallets in good condition.[6] COGSA plaintiffs often use the carrier's bill of lading to establish the first element of a prima facie case. "A clean bill of lading is prima facie evidence that the carrier received the goods it describes. It creates a rebuttable presumption the goods were delivered to the carrier in good condition and thus satisfies that element of the plaintiff's prima facia case." *Terman Foods, Inc. v. Omega Lines*, 707 F.2d 1225, 1226 (11th Cir. 1983) (citations omitted). However, in order for a bill of lading to constitute prima facie proof that the carrier received cargo in a sealed container, the bill of lading "must either be without limiting language such as 'shipper's load and count' or it must contain terms that the carrier can verify." *Plastique* at 1369-70. If the carrier cannot verify terms in the bill of lading, the shipper can still satisfy its prima facie case by submitting eyewitness testimony or other

---

[6] While COGSA only covers transport from the port of receipt to the port of discharge, a carrier and a shipper can extend COGSA so that it applies prior to loading and subsequent to discharge of goods from a ship. *Fireman's Fund Ins. Co. v. Tropical Shipping and Const. Co., Ltd.*, 254 F.3d 987, 995 (11th Cir. 2001). Motta and Seaboard did just that by executing a bill of lading expressly stating that the provisions of COGSA shall govern "before loading on and after discharge from the vessel and throughout the entire time the Goods or Containers ... are in the care, custody and/or control of [Seaboard and its] agents...." In this case, the cargo was delivered to Seaboard at the Crossroads warehouse in Miami and outturned at Motta's warehouse in Panama.

evidence to establish the condition of the goods upon delivery and outturn. *See Fine Foliage of Florida, Inc. v. Bowman Trans., Inc.*, 901 F.2d 1034, 1038 (11th Cir. 1990) (addressing identical standards under the Carmack Amendment); *Highlands Ins. Co. v. Strachan Shipping Co.*, 772 F.2d 1520, 1521 (11th Cir. 1985).

Here, Plaintiffs have submitted both the Seaboard bill of lading and eyewitness testimony to establish the first element of their prima facie case. While the bill of lading contains the limiting language, "Particulars Furnished By Shipper," it also states that the gross weight of the cargo is 12,211 pounds. Cargo weight in a bill of lading is easy to verify and can establish the first element of a prima facie case. *See, e.g., Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 33 (2d Cir. 1982); *PT Indonesia Epson Ind. v. Orient Overseas Container Line, Inc.*, 219 F. Supp. 2d 1265, 1270-71 (S.D. Fla. 2002). Plaintiffs also offer Crossroads' warehouse supervisor Guillermo Ortega's eyewitness testimony that he saw Crossroads employees transload 11 pallets and 5 cartons from the APL Container into the Seaboard Container.[7] Unrebutted, either method of proof satisfies the first element of a prima facie case.

Seaboard attempts to refute this evidence by claiming the cargo weights listed in the Declaracion de Movimento (Ex. 21) contradict the weights listed on Crossroads' packing documents,[8] but the document is not admissible as to the weight of the cargo. Seaboard has not put forth any "evidence

---

[7] Seaboard challenges the admissibility of Ortega's affidavit, citing case law discussing courts' ability to reject "sham" affidavits when adjudicating motions for summary judgment. However, affidavits submitted in a summary judgment proceeding cannot be disregarded simply because the witness' memory of the events discussed in the affidavit are not clear during the deposition. "To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words (in this case, the affiant) was stating the truth." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). Here, Ortega's affidavit is clearly not a sham the Court can disregard simply because he stated at one point in his deposition that he could not remember much about the transloading two years after it took place and refreshed his recollection before the deposition by reviewing a video of the transloading. (Ortega Dep. at 34-35). Seaboard has taken a "sound bite" in an attempt to create an issue that does not exist.

[8] The Declaracion de Movimento provides a total weight for the cargo consistent with the weight of 12,211 pounds in the bill of lading, but has some discrepancies with Motta's packing documents, including a weight for the video game cargo inconsistent with the weight for the Wii consoles in those documents. Specifically, it provides a total cargo weight of 5,538.90 kilos, or about 12,186 pounds, but provides a weight for the "video juegos," or video game cargo, of 3,400 kilos, or 7,480 pounds. (Ex. 21).

sufficient to support a finding that the [document] in question is what its proponent claims," i.e., a record reflecting an accurate assessment of the weight of the cargo. Fed. R. Evid. 901(a).[9]  A non-movant cannot defeat a motion for summary judgment with inadmissible evidence and, on summary judgment, "a court is not obligated to take as true testimony that is not based on personal knowledge." *Corwin v. Walt Disney World Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007).  Because Seaboard has no evidence to show that the Declaracion de Movimento reflects a measurement of the weight of the cargo in the Seaboard Container, it cannot use the Declaracion to contest that weight.  As Seaboard has no evidence to rebut either the weight listed in the bill of lading or eyewitness testimony that 11 pallets of Wiis and 1 box of Canon cameras were loaded into the Container, Plaintiffs have proven as a matter of law that Motta delivered 11 pallets and 1 box of Canon cameras to Seaboard.

### 2.    Missing Goods at Outturn

Having established the first element of its prima facie case with two methods of proof, the weight in the bill of lading and eyewitness testimony, Plaintiffs can satisfy the second element by showing either missing weight or missing containers at outturn. *See, e.g., Westway*, 675 F.2d 30, 33 (2d Cir. 1982) (shortfall in number of cartons in sealed container satisfied second element of prima facie case when first element was established through weight in bill of lading).  Plaintiffs offer evidence supporting both methods of proof.

Motta's failure to submit a claim for the missing Wiis within three days of outturn triggers a weak legal presumption that Seaboard delivered them in good condition.  Section 1306(6) COGSA states as follows:

> Unless loss of notice or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the

---

[9] While Motta's import and claims manager, Ricardo Williams produced the Declaracion, Seaboard's counsel has admitted that Williams was never asked about the document (Chipsen Dep. 22-23).  As a result, its origin and the source of the information listed therein is a complete mystery.  Furthermore, Motta's warehouse supervisor, Gerardo Lan, testified that he did not consult the weights listed in the document, that he did not know if the weight in the document was correct, and that the description of the contents provided in the load list sent from Miami (Blandon Dec., Ex. CC) trump the description in the Declaracion.  (Lan Dep. at 8, 18, 39-40).

removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. *If the loss or damage is not apparent, the notice must be given within three days of delivery.*

(emphasis added). When the shipper fails to give timely notice, this provision creates a presumption that the carrier delivered the cargo in good order. *Bally Inc. v. M.V. Zim America*, 22 F.3d 65, 71 (2d Cir. 1994). However, this presumption is "normally not conclusive" and "disappears from the case once the [plaintiff] comes forward with sufficient evidence that the cargo was damaged or short prior to delivery." *Id; see also, Harbert Int'l Establishment v. Power Shipping*, 635 F.2d 370, 373 (5th Cir. Unit B 1981) (presumption is "exhausted" once plaintiff produces sufficient evidence to indicate that loss occurred prior to discharge); *Associated Metals and Minerals Corp. v. Etelae Suomin Laiva*, 671 F. Supp. 743, 750 (M.D. Fla. 1987).

Plaintiffs' evidence easily rebuts this presumption. First, the fact that the Container was missing 5,500 to 6,600 pounds of cargo at the Port of Miami, during Seaboard's possession of the Container, is compelling evidence that 6 pallets of Wiis were missing at outturn. *See Transatlantic*, 137 F.3d 94, 99 (plaintiff need not produce evidence directly pertaining to delivery and outturn to establish prima facie case). Plaintiffs have bolstered this proof with eyewitness testimony and video evidence[10] that only five pallets were in the Container when it was opened, as well as evidence that the Container was kept under tight security between outturn and opening.[11] Given the weakness of the resulting legal presumption and Plaintiffs' convincing evidence of loss at outturn, Motta's failure to give notice until 6 days after outturn is immaterial. *See, e.g., Transatlantic* (affirming summary judgment for plaintiff despite carrier's claim

---

[10] While Plaintiffs have not submitted an affidavit authenticating the video (Ex. 8), Williams' deposition testimony establishes that the video submitted is, in fact, a video of the Seaboard Container's opening and unloading. (Williams Dep. at 20-21, 31).

[11] Furthermore, the record contains a reasonable explanation for Motta's untimely notice. Lan, who supervised the unloading, was not responsible for counting the number of Wii cartons and did not have a load list describing the number of Wii pallets that were supposed to be in the Container. As a result, he did not notice that 6 pallets were missing. (Lan Dep. at 31-33). Lan was able to readily detect the missing cameras because the box was open and empty, so Motta reported their loss in a timely fashion.

that notice of damage was belated).

However, Seaboard maintains that Plaintiffs still cannot prove the second element of their prima facie case as a matter of law because the Container was left on Motta's property for twenty-four hours before it was opened and the seals on the Container were found to be intact at unloading. First, as is mentioned above, Plaintiffs have submitted proof refuting the possibility that the pallets somehow went missing in Motta's custody. The Parties do not dispute that during the twenty-four hours between outturn at Motta's property in Panama and the opening of the Container, the Container was kept inside a closed hangar with metal doors that was monitored by twenty-four hour guard security and accessible only through a locked gate. Seaboard has produced no evidence that these security measures were breached. While it argues that the goods *may* have been lost between outturn and opening of the Container, "[s]uggestions of bizarre occurences ... and conjectures unsupported by evidence" cannot raise a genuine issue of fact. *Transatlantic*, 137 F.3d at 99.

Seaboard also argues that Plaintiffs cannot prove loss at outturn because the seals on the Container were found to be intact at unloading. However, *Bally Inc. v. M.V. Zim America*, 22 F.3d 65 (2d Cir. 1994), a case Seaboard relies upon in its opposition brief, states that "[t]he significance of a security seal ... of course will depend on the unique facts of the case. Delivery by a carrier of a container with an intact seal does not conclusively prove that loss did not occur while the container was in the carrier's possession." 22 F.3d at 70.[12] Evidence that seals are intact is especially insignificant when the record contains evidence of tampering. *See, e.g., Leather's Best Int'l v. MV "Lloyd Sergipe,"* 760 F. Supp. 301, 307 n.14 (S.D.N.Y. 1991) (plaintiff proves prima facie case when seals were found to have been tampered with upon opening but were initially reported to be intact); *Westway Coffee Corp. v. M.V.*

---

[12] In *Bally*, the Court noted that the integrity of the seals helped establish the plaintiff's failure to prove the second element of its prima facie case "in *this* case" because "there was no evidence that the container had been tampered with, and [plaintiff] does not suggest that the high-security seal had been breached." 22 F.3d 65, 70 (emphasis in original). Here, however, Plaintiffs have presented evidence of tampering with both the Locking Bracket and rivets on the right-hand door.

Page 15 of 22

*Netuno*, 528 F. Supp. 113, 117-118 (S.D.N.Y. 1981) (evidence seals were intact "is not conclusive" when seals could easily be duplicated or locks could easily have been picked).

In this case, Plaintiffs present evidence of tampering with the Locking Bracket on the bar seal and the locking mechanism on the right-hand door. Plaintiffs' expert surveyor, Brian Mahoney, found that a hole had been drilled into the back of the Locking Bracket of the bar seal and asserts that the hole would enable the removal of the locking pin and opening of the bar seal. Furthermore, Mahoney found evidence suggesting the backside of a rivet of a locking device on the right-hand door had been removed. Though Seaboard attempts to undermine the credibility of the tampering evidence, it presents no evidence of its own to dispute Mahoney's findings or expert opinion.[13] Lan's observation, after a brief and superficial examination, that the seals were intact and free from tampering is immaterial in this context.

Having provided undisputed evidence of missing weight at outturn, and supplemental undisputed evidence of constant security of the Container following Seaboard's delivery, missing cargo at opening and tampering with the Container's locking mechanisms, Plaintiffs' are entitled to summary judgment on the second element of their prima facie case. While Seaboard raises hypotheticals as to what may have happened to the goods prior to or after delivery, the Court need not "engage in fanciful assumptions that the harm might possibly have occurred outside the defendants' control." *Transatlantic* at 99.

### 3.    "Q Clause" Defense

Since Plaintiffs have established their prima facie case as a matter of law, Seaboard must come

---

[13] Seaboard claims in response that there is a dispute as to whether there was a hole in the back of the Locking Bracket when the container doors were opened. However, nothing in the record indicates the hole was made in the Locking Bracket after the Container was opened. Instead, the evidence simply indicates that neither Motta's employees nor the insurance surveyor saw or made a record of the hole. While Lan did not see the hole, it is clear from the unloading video that he did not look at the back of the Locking Bracket. (Ex. 8). Lan also testified that the Locking Bracket was not removed from the Container in his presence (Lan Dep. at 41), indicating he never had an opportunity to observe the hole. Ricardo Williams, Motta's import and claims manager, never saw the hole but also testified that he never looked for it. Finally, Seaboard's claim that the surveyor "found no hole" misreads the record. The surveyor's report does not mention a hole, but the record fails to indicate whether the surveyor found a hole was not present, failed to observe a hole, or observed a hole but never made a note of it.

forward with some evidence of due diligence or a statutory exemption to survive Plaintiffs' motion for summary judgment. "Once the shipper establishes a prima facie case, the burden of proof shifts to the carrier to prove either it exercised due diligence to prevent the damage ... or that the harm resulted from one of the excepted causes" listed in the statute. *Terman Foods, Inc. v. Omega Lines*, 707 F.2d 1225, 1227 (11th Cir. 1983). If a plaintiff has established its prima facie case, "the carrier must 'explain what took place or suffer the consequences.'" *Quaker Oats Co. v. M/V Torvanger*, 734 F.2d 238, 243 (5th Cir. 1984) (quoting *Compagnie De Navigation etc. v. Mondial United Corp.*, 316 F.2d 163, 170 (5th Cir. 1963)). "The law casts upon [the carrier] the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability." *Quaker Oats*, 734 F.2d at 243 (quotation omitted).

Seaboard claims that it has evidence to support a defense under COGSA's "Q Clause," which absolves a carrier from liability for losses that are not attributable to the carrier's fault or negligence. A carrier is not responsible for loss "arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier." 46 U.S.C. § 30701, Sec. 4(2)(q). In asserting a defense under the Q Clause, "the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier contributed to the loss or damage." *Id.*

However, Seaboard does not provide an "expl[anation of] what took place" such that it can raise a defense under Section 4(2)(q). Seaboard offers no evidence from Newport's truck driver or any other Seaboard witness that proffers an explanation as to how the goods went missing during Seaboard's custody of the Container without fault on the part of Seaboard or its agents. *Compare Terman*, 707 F.2d at 1228 (defendant cannot invoke Clause Q when it failed to present testimony from its employees suggesting it was not liable for any part of the damage), *with PT Indonesia*, 219 F. Supp. 2d 1265, 1273-74 (issue of material fact presented when truck driver asserted cargo was hijacked). Instead, its response only attacks the credibility of the evidence undermining Plaintiffs' prima facie case, never presenting

evidence that could raise a genuine issue of fact as to whether the Q clause can apply.[14]  As Plaintiffs have established their prima facie case and Defendants have offered no evidence raising a genuine issue of fact, Plaintiffs are entitled to summary judgment against Seaboard on their COGSA-governed breach of contract claim.

### 4.    Damages

Next, the Court must address the Parties' cross-motions for summary judgment on damages.  The Parties ground their respective arguments on differing interpretations of the limitation of liability provision in the Seaboard bill of lading.  This provision limits Plaintiffs' recovery to "$500 per package or per shipping unit."  Plaintiffs request $126,500.00 based on a loss of 252 cartons of Wiis and 1 box of Canon cameras.  Seaboard's Motion for Partial Summary Judgment [DE-62] claims that Plaintiffs are entitled to only $3,500 in damages based on a loss of 6 Wii pallets and 1 box of Canon cameras.

COGSA has a limitation-of-liability provision, but parties are free to amend that provision in their bill of lading as long as the amendment is in favor of the shipper.  46 U.S.C. § 30701, Notes Sec. 7; *see Vegas v. Compania Anonima Venezolana de Navegacion*, 720 F.2d 629, 630 (11th Cir. 1983) (COGSA's limited liability provision was enacted to "set a reasonable limitation on liability which carriers by law could not reduce by contract").  Here, the Parties have amended the limitation of liability provision by setting a limit for liability "per package or per shipping unit" and defining each "shipping unit" as "each physical unit or *piece of cargo not shipped in a package*, including articles or things of any description whatsoever...."  In addressing the competing motions for summary judgment on damages, the Court must address whether the lost cargo was shipped in "packages" or some other "shipping unit" and then ascertain the number of packages or shipping units for which Plaintiffs can assert damages.

---

[14]  Seaboard suggests in its response that the evidence of intact seals also supports a Q Clause defense.  It cites one case in support, *Roco Carriers, Ltd. v. M/V Nurnberg Express*, where the court, after holding the Plaintiff had proven a prima facie case, found that evidence of intact seals indicated no fault on the part of a carrier.  1989 WL 66675, *3 (granting summary judgment for one carrier based on intact seals, but granting plaintiff's motion for summary judgment on conversion action against second carrier).  However, in *Roco*, intact seals indicated that one defendant was responsible for the loss or damage of goods and not the second.  Here, the loss of the Wii pallets could only have taken place on Seaboard's watch.

Unfortunately, the term 'package' is not defined in COGSA. *Hayes-Leger Assocs., Inc. v. M/V Oriental Knight*, 765 F.2d 1076, 1079. However, in the Eleventh Circuit, a "package" is considered to be "a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made, which facilitates handling but which does not necessarily conceal or completely enclose the goods." *Id.* at 1078, 1082 (quotation omitted).

The "touchstone" and analysis as to whether the goods in a container are enclosed in "packages" is "the contractual agreement between the parties as set forth in the bill of lading." *Fireman's Fund Ins. Co. v. Tropical Shipping and Construction Co., Ltd.*, 254 F.3d 987, 997 (11th Cir. 2001). When a shipper places goods in packages "as used in the ordinary sense of the word" and the number of the packages within the container is disclosed to the carrier in the bill of lading or otherwise, each described package or unit within the container constitutes a package. *Allstate Ins. Co. v. Inversiones Navieras Imparca, C.A.*, 646 F.2d 169, 172 (5th Cir. Unit B 1981). If, however, "a bill of lading lists the number of containers as the number of packages, and fails to disclose the number of COGSA packages within each container," the container itself is the "package" under COGSA's limitation of liability provision. *Hayes-Leger*, 765 F.2d at 1080. "[A]n ambiguity on a bill of lading regarding the number of COGSA packages should be resolved in favor of the shipper." *Sony Magnetic Prods. v. Merivienti O/Y*, 863 F.2d 1537, 1542 (11th Cir. 1989).

Here, Seaboard's bill of lading identified the "No. of Pkgs." as "1" while describing the cargo as "1 40' DRY HIGH CUBE CNTR S.L.W.C. 487 PCS [pieces] CONTG ELECTRONICS-VIDEO GAMES PHOTO CAMERA." Because the bill of lading lists the number of containers (1) as the number of packages, the Court must determine whether the description adequately identifies the number of packages or whether the Seaboard bill of lading describes the cargo such that it must be "classified as 'goods not shipped in packages.'" *Hayes-Leger*, 765 F.2d at 1080.

"The fact that the term 'pieces' is used to describe plaintiff's cargo can cut either way" on this issue. *Transatlantic Marine Claims Agency, Inc.*, 1993 U.S. Dist. LEXIS 4555, *10 (S.D.N.Y. Apr. 9,

1993).  In *Hayes-Leger*, the Eleventh Circuit held that use of the term "pieces" in the description, "1

CONTAINER SAID TO CONTAIN: 3,542 PCS. WOVEN BASKETS AND RATTAN FURNITURES,"

was "insufficient to indicate to the carrier that the goods were 'packaged.'  765 F.2d at 1081, n.9.  In

doing so, the Court cited to the Second Circuit case, *Binladen BSB Landscaping v. M.V. "Nedlloyd*

*Rotterdam,"* 759 F.2d 1006 (2d Cir. 1985), which stated that a shipper intending to rely on the

description portion of the bill of lading to disclose the number of "packages" must indicate "the number

of items qualifying as packages (i.e., connoting preparation in some way for transport), such as 'bundles,'

'cartons,' or the like.'" *Id.* at 1013-14.

However, a district court in the Second Circuit has since held that containers of printing presses

and spare parts contained "packages" under COGSA when the description of the cargo in the bill of

lading used the term "pieces." *Transatlantic*, 1993 U.S. Dist. LEXIS 4555 (S.D.N.Y. Apr. 9, 1993).  The

Court held that use of that term complied with *Binladen*'s requirement that the bill of lading "'describe

objects that can reasonably be understood from the description as being packages' or that it 'indicate an

alternative number of packages'" apart from the container itself.  *Id.* at * 13.  Undisputed evidence that

the machinery was packed and wrapped in clear plastic prior to transport supported this holding because

it established preparation of the cargo that could facilitate its transport.  *Id.* at *12.

In this case, the bill of lading's description of cargo constituted by "pieces" of electronics,

cameras and video games indicated to Seaboard that it was shipping "packages" of electronics

equipment.  The undisputed evidence reflects that the "pieces" referenced in the bill of lading were

actually cartons of Wiis that each contained 3 Wii consoles.  Cartons are unquestionably "packages" "as

used in the ordinary sense of the word," *Allstate*, 646 F.2d 169, 172, and is a form of package expressly

recognized in *Binladin*.[15]  Additionally, electronics equipment is a form cargo that one would assume to

---

[15] Seaboard discusses in its briefs *Oriental Overseas Container Line, Ltd. v. Sealand Serv., Inc.*, 122 F.
Supp. 2d 481 (S.D.N.Y. 2000), where a court found that use of term "pieces" to describe cargo of car engines was
insufficient to identify "packages" as the engines were loaded on racks that were the proper packaging unit.  Here,
however, the "pieces" referred to in the bill of lading were cartons, which are obviously a proper packaging unit.

be shipped overseas in packaged form.

Furthermore, Plaintiffs are entitled to damages based on the packages identified in the bill of lading, even if those packages were loaded on pallets before being placed in the container. *See Sony Magnetic Products, Inc. v. Merivient O/Y*, 863 F.2d 1537, 1539 (11th Cir. 1989) (plaintiff entitled to damages based on 1320 cartons when bill of lading identified "1320 ctns," even though the cartons were enclosed in 52 pallets); *Vegas v. Compania Anonima Venezolana de Navegacion*, 720 F.2d 629, 631 (11th Cir. 1983) (package limitation applies to 109 cartons of brake parts and not 2 pallets of cartons when shipper identifies cargo of "109 cartons"). Here, there is no ambiguity in the bill of lading to suggest that pallets could be the relevant packaging unit. As a result, under the terms of the bill of lading, Plaintiffs are entitled to $500 for each of the lost packages identified therein, not for each lost pallet.[16]

Here, Plaintiffs have proven the loss of 252 packages of Wii consoles and 1 package of Canon cameras. As a result, they are entitled to $126,500 in damages, per the bill of lading's limit of $500 in damages for each lost package. Furthermore, the Court will grant Plaintiffs request for prejudgment interest as there are no peculiar circumstances such as mutual fault or an inflated damages demand that would justify denying it. *See Steelmet, Inc. v. Caribe Towing Corp.*, 842 F.2d 1237, 1243-44 (11th Cir. 1988) (prejudgment interest shall generally be awarded in admiralty cases absent peculiar circumstances); *Dow Chemical Co. v. M/V Gulf Seas*, 593 F.2d 613, 614 (5th Cir. 1979) (peculiar circumstances justifying denial of prejudgment interest include legitimate dispute as to liability, mutual fault or inflated damages demand).

For the reasons discussed above, it is hereby

---

[16] The result would be the same even if the bill of lading's description of "pieces" was insufficient to identify "packages" within the Container. The bill of lading provides for damages "per package *or* per shipping unit" and defines each "shipping unit" as "each physical unit or *piece of cargo not shipped in a package*, including articles or things of any description whatsoever...." As a result, even if the bill of lading did not present a description of the number of "packages," Plaintiffs would not be left with only $500 in damages based on losses from one container, as would be the case under a standard COGSA analysis. *Hayes-Leger*, 765 F.2d at 1080. Instead, Plaintiffs would still be entitled to damages for losses of all "piece[s] of cargo" identified in the bill of lading.

ORDERED that:

(1) Plaintiffs' Motion for Summary Judgment [DE-65] is GRANTED;

(2) Defendant Seaboard's Motion for Partial Summary Judgment [DE-62] is DENIED; and

(3) the Court will enter final judgment for Plaintiff in a separate order.

DONE AND ORDERED in Miami, Florida, this 9ᵀᴴ day of October, 2009.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record